Case number 18-6130. Michael Scott et al. versus First Southern National Bank. Arguments not to exceed 15 minutes per side. Mr. Getty, you may proceed for the appellant. Please the court, opposing counsel, I'm here on behalf of the appellant and in an unusual way I want to first tell you what this case is not about. This case involves two professional dentists who had a lending relationship with this bank over 20 years. What it is not about, it is not a case where someone had a loan with a bank, didn't pay the loan, and then refused to pay it and litigated with the bank. This is a situation where these customers had never been in arrears, never made a late payment, was no reason for the bank to do what it did and they breached its duties when it did what it did. In 1998, Dr. Scott and Dr. Larkin made the first loan of $590,000 loan on their dental office in Lexington. They paid every payments throughout, were never in and a fellow named Rocky Mason, who had previously been the bank's IT person, he switched over, I think, a couple years after the IT. He'd only been a loan officer for three or four years and in February of 2009, there was a revolving line of credit of $300,000. That's one of the two loans involved here. The second loan is a construction loan for $1,013,514 involving a property, an old hotel that the doctor wanted to renovate and turn into a multi-purpose project, a sports bar, dental offices, and apartments. The first point you're making when you stood up, I think, was about a point about fault, that sometimes there's obvious fault here, maybe by the borrower, and you're saying, I think, you're saying that the borrower here maybe wasn't at fault. Does that change our analysis about the requirement to investigate with the reporting agency? Typically an obligation, right? That obligation is standard, you know, it's static, period. The fault point you made at the beginning doesn't really change. No, but I simply want you all to know that we're not in a situation where we have a deadbeat borrower, okay? These are exemplary people. Right, but we have to focus on the relevant, that doesn't really inform the legal questions. I appreciate the equities point. Well, I want you to have your, I want you to be focused on who you're dealing with here as litigants. I mean, most of these cases come up to you. I mean, I'm usually on the other side in these cases. I'm not usually on this side. I represent banks, and I took this case because I thought the banks violated their duties. First of all, with respect to the construction loan, from day one, Mr. Mason knew that there were going to be cost overruns. He knew that. In fact, he built $56,000 into the loan for cost overruns. The problem here was this loan officer wasn't experienced. He made statements and led my clients, particularly Dr. Scott, to believe that it was no problem that this project would be funded to the end. He made those statements both before the loan was closed, and he made them continuously thereafter. I mean, frankly. It was never written down, right? It doesn't need to be. Under the Ham case and other cases that we cited you, a subsequent oral statement modifies the written contract. The merger clause is trumped by conduct along those lines. This is not a situation where you can say you have a written contract that wasn't modified or changed, and that there weren't affirmative representations about the present intent of the bank, both at the time the loan was made and after. Just to make sure I understand your argument, I think your friend on the other side would say the statute of frauds, if I'm thinking of the right argument, would require that that be written down. I think that's what your friend would say. What I'm saying is this is an exception to the statute of frauds. We cited your cases in the briefs. One is the Ham case that comes to mind that says that that a requirement that there be a written amendment to the to the document. Let me ask you one thing about that. This matter of whether the statute of frauds applies, obviously it's something in dispute. Your opposing counsel is arguing a contrary position regarding the statute of frauds and you did not argue the statute of frauds, as I understand it, in the district court. You've only briefed that on appeal, so there's an issue as to whether you've really forfeited your position or your argument regarding whether the statute of frauds would apply or not apply. How would you respond to that concern? Well, I think we did. We cited the Ham case, I believe, and others where we said that there was a representation before the closing of the loan and continuous representations afterward. We clearly pled that. But you didn't really argue the statute of frauds issue before the district and in your brief. What we argued was a course of performance. You doubted in your brief on appeal. What we argued was a persistent course of conduct which satisfies getting around the statute of frauds. The course of conduct between Mr. Mason and between Dr. Scott were such that he assured him repeatedly that they would complete the project and that sufficient funding would be allowed. I mean, the statute of frauds is secondary. I mean, here are affirmative representations to the effect that we will provide funding, including cost overruns, to finish this project. The loan officer visited the project July 28, 2013, August, September, October, November, December, January, February, March. He was there every month. He knew exactly what was going on. He knew what contractors were doing work. He knew what surprises were taking place. You know, when you do a renovation, you open up a wall and you see, you know, rotting timbers. You have to replace them. This was clearly a renovation. He had had two experiences with loans similarly and they were things brought to him by his father. His cousin had a renovation in Bowling Green of some downtown building and there was an HOA which had termite problems in fact, before he became the IT officer, I think he or his father owned the building in which First Southern, you know, had their branch in Lexington. But, you know, the discussion. It sounds like he was an experienced lender. He wasn't. I thought you just said that he had, okay, I'm sorry. I thought you said he confronted other construction projects. No, the only projects he ever had was those that his cousin or a loan down in North Carolina. He was not experienced with renovations and that was one of the problems because he put in $56,000 to cover cost overruns. He should have known that, you know, that figure was, you know, not sufficient. And, you know, when Dr. Scott came to him in November and said, I'm going to need another $400,000, one of the things they discovered was a vault. It was a vault that they had no idea was even in the building. Apparently it was a hotel and possibly a bank of some sort or a savings and loan. There are a lot of savings and loans in this area, in Cincinnati, traditionally. But he was not sufficiently experienced. He also waited two months plus. So you have on the one hand an inexperienced lender and an inexperienced borrower. Well, Dr. Scott had done, had had rental properties, you know, over the years and he had borrowed money previously, but he usually did that with his prior loan officer. What happened here was he was led to believe, both before the loan and after the loan were uncovered, what turned the thing upside down was they asked for a credit report as part of the process of approving the additional funds and the credit analyst who had done the work on the construction loan a year earlier said that she uncovered two loans that he made with the United Bank. His old loan officer went over to the United Bank. And at that point, everything stopped. And it's our theory that when they saw that he had gone and borrowed money from another bank, they cut his feet out from under him on this. He paid every cent of this loan off, including a 28% prepayment penalty that he asked them to waive after being a customer since 1998, and they refused to do it. So, you know, there are plenty of facts here. This case should have gone to the jury, because there were plenty of facts here as to what the conduct, what the representations were, and it should not have been decided on a summary judgment motion. With respect to the other claim, this is, this is a situation where, you know, the reporting claim? Yeah, the reporting claim. They knew that the, that the renewal, what happened here was the renewal, the $300,000 loan had been subject to renewal repeatedly, had always been renewed, and in the process until it was, you know, closed. You have a process between you file the request for the loan and then you close it. They'd always paid interest. Here, the bank didn't send them the monthly interest payments. So, of the bank's own fault, the thing was past due, technically, on paper. They never told the Scots that, that that was the case, and they, it automatically, you know, the way this, these things are reported, there's, there's automatic information goes to the credit reporting. So, it was reported as delinquent. When they found out about it, because Clarion Financial, who for years, you know, had financed dental equipment and dental supplies, said, you know, you got a bad credit report. I agree, there's, you know, you can be delinquent and then you can be delinquent, and this is probably not the most egregious example of delinquency, but isn't there this pretty irony? Well, the problem here is that they knew it. In fact, they wrote a letter and said it was erroneous information. I'm sorry, I'll just, I'm just, so, but isn't there a pretty ironclad requirement in the law that your client had to take this up with the reporting agency, and to then, to then create a duty back to the lender? Yes, and this is a situation where, I've never said this in 40-some years of practicing law, but I, I truly mean it. I've heard the phrase, this is a situation where the law is an ass, because if the bank knows that they reported erroneous information, and they tell my client, this has got to be an exception, they tell my client, don't call them, it's going to affect your credit report. And then, here's the catch-22, and then, after we find out it's still not been corrected, I had to write two letters to have them correct it, and it finally gets corrected. Counsel, just, I know your light's on, but when you came into the case, or counsel came into the case in March 2015, why didn't counsel contact the credit reporting agency? Because we had been told that it would affect his credit report, and I've verified that with my banks. They say that if, if, if you have a situation, and you, if you repeatedly ask for your credit report, it will reduce your credit, your credit score. I mean, this man had, this dentist, had a 750 plus credit rating, which dropped appreciably because of these, these errors. I mean, there has, there has to be some remedy here, is my point. This has to be a, a situation where factually, you have to have an exception, or craft an exception, where this catch-22 cannot bite somebody like Dr. Scott, you know, in the behind when he's told, don't call, don't do anything. You know, we finally, we finally did, actually, I believe, at the end, copy the credit reporting agency on the last letter. But, you know, this was an obligation of the bank. The bank should not have allowed this situation to take place. I'm sorry I went over. I know you're out of time, but it almost sounds like you're, in an equitable estoppel argument, but that's, that equitable estoppel is not really set forth as a separate argument in your basis in your brief. No, I'm not making that argument. Oh, all right. What I'm arguing is, I'm arguing that under the statute, we say that the Miller versus Wells Fargo approach, the statutory approach to these situations, should be adopted. And that says that the furniture is protected where it's a state statutory claim. This is not a state statutory claim. It's a state, it's a common law tort, breach of fiduciary, under Kentucky law, a breach of fiduciary duty, interference with prospective advantage. Those are the tort claims that you have a claim, and the furniture is, the furniture, I want to say furniture, but it's, it's furniture, is not protected where there's willful and malicious conduct. What could be more malicious than telling the man it's fixed, failing to fix it, and then telling him don't contact them, don't contact them, it'll, it'll affect you negatively. That's our argument. I'm sorry I went over, thank you. Sure, thanks. May it please the court, opposing counsel, my name is Coley Stills. I'm here with Stan Cave today on behalf of the Appleby First Southern National Bank. The appellants have spent significant time in the oral argument they just made, and over half of their brief arguing about facts. And we would submit that many of those facts are not actually supported by the record in this case, and First Southern disputes some of those facts as well, but there's really only three critical facts to reviewing the district court's entry of summary judgment that are all undisputed, that are dispositive in this case. The appellants admit that they never submitted a dispute to a credit reporting agency, and that is dispositive of their Fair Credit Reporting Act claim, which I will get to in a second. The appellants admit that they signed at least five integrated loan documents, including a commercial loan agreement, a line of credit agreement, and three mortgages that expressly limited the amount of funds that the First Southern National Bank was committed to lend them, and that it understood that there were limits on those, and that they understood that there were limits on those advances that they agreed to in writing. And finally, they admit that the alleged commitments that they're saying that First Southern made to see this project through, and to provide any additional financing that would be necessary, are nowhere in writing, despite the fact that there are prolific text messages between the borrower and the loan officer in this case. First Southern produced thousands of documents in this case. They have not pointed to a single document reflecting the commitment that they, the commitment to lend additional funds that they allege, and so therefore, First Southern asks that the summary judgment, will ask the summary judgment entered by the district court below be affirmed in all respects. I wanted to spend a little bit of time talking about the Fair Credit Reporting Act. The Fair Credit Reporting Act imposes two obligations on furnishers of information to credit reporting agencies, like the bank in this case. And those two obligations are first, to initially provide accurate information. In the statute, there's a whole list of obligations with respect to the initial reporting requirement. And then the second is to reinvestigate claims that are disputed by a consumer upon receipt from a consumer reporting agency of notice of the dispute. The appellant keeps saying, well if we had notified them, that would have affected our credit score. Is that true? If they had notified the TransUnion about their dispute, would that have affected their credit score? Judge, not to my knowledge. That's certainly not in evidence in the record that it would have lowered their credit score to have lodged a dispute. What the appellant's counsel was referring to was an email. The borrower checked in on the status at some point, I believe in October of 2014, on the status of the credit reporting issue. And an administrative assistant for the bank emailed back, said she had checked with the credit administration manager who handles credit reporting issues. And that he had suggested, the language in the email is actually, he should check your credit report just now because that might lower your credit score. It was not a statement that you shouldn't dispute this if you disagree with it. It was not a statement that you should never check your credit report or you should never look into this or dispute anything. And secondly, several months after that, appellant's counsel was engaged to represent the appellants in this case. And in fact, sent letters to the bank saying, this still has not been resolved. Yet before filing of this lawsuit, several years later, a dispute was never lodged with the credit reporting agencies. And the Fair Credit Reporting Act makes it very clear that only the second obligation imposed on furnishers, the obligation upon receipt of a notice of a dispute to do a reinvestigation, only that obligation can be enforced through a private right of action. It's very clear in the statute. The Sixth Circuit has upheld it in the Brown versus Wal-Mart stores case that we've cited. And here, there is no dispute. That triggering requirement was never met. There was never a dispute filed with a credit reporting agency. There's an affidavit in record from the credit administration manager for the bank saying, First Southern never received a dispute from a credit reporting agency. The appellant's own cases for this alleged proposition, Judge Clay, I think you kind of referred to it as an estoppel. I don't see an estoppel argument actually in the brief anywhere. But the cases that they cite to try to support that the requirement of the statute should be ignored, that the triggering requirement be met, actually don't apply here. They cited the Saunders case out of the Fourth Circuit, which was actually a case where the Fourth Circuit noted that the consumer actually did appropriately notify the consumer. And then the Jones case that they cite is inapplicable. It dealt with a different statute that did not deal with a furnisher of information. So we would assert that the failure to address that triggering requirement, which the district court held was dispositive of the Fair Credit Reporting Act claims, should be upheld on appeal. They have a fraudulent misrepresentation claim too, right? They did, Your Honor. Absolutely. So first on the fraudulent misrepresentation claim, the district court's analysis of that claim was to dismiss it based on the statute of frauds. And in the appellant's brief, the district court spent several pages analyzing that claim. And in the appellant's brief, they nowhere addressed the district court's analysis of that claim. And so we would submit that under the court's clear precedent, that that's a waiver of any challenge the district court's... Well, they do, both this morning and a little bit sort of theme of their case, is that your client made representations, commitments, albeit oral, not in writing, that there'd be continued funding. And that it was envisioned that there would potentially be the need for continued funding, and at the right time that would happen. And there were extensions of time for a while, I think, on the loan. And then they say you caught wind of the fact that maybe they're going to get financing somewhere else, and you guys pulled the plug. And that was contrary to a pretty long series of representations. Maybe they would say made by an inexperienced loan officer. Do we... Does all that completely... Does the statute of frauds override all of that? And is that not something that maybe a fact finder should determine? Your Honor, I would submit that the failure to address the district court's argument and provide any basis to overturn the district court's argument on that would be a basis to affirm. I got that. I would also... Assuming they made the argument I just made. Understood. Yes, we believe there's additional basis to affirm the district court's dismissal that are supported by the record. A fraud claim in Kentucky requires clear and convincing evidence of several elements, including a material misrepresentation. And any time that there is a representation that involves a promise of a future event, I will lend you money, that kind of a fraudulent if the person making the declarant, making the representation, has no present intention at that time to perform that commitment. And in this case, we submitted evidence to the district court and it's cited in our brief as well. That's not the case here. Dr. Scott admitted in his deposition that he didn't ever believe that Mr. Mason was attempting to mislead him. That he believed that Mr. Mason always believed that he would achieve the commitments that he represented were being made, which first other disputes of those representations were made, by the way. But the admission by the appellant that that kind of a commitment was always made with the intention to perform is not fraud under clear Kentucky law. I think Mr. Scott would say he still relied on those, albeit earnest representations. So... Relied to his... Justifiable reliance on a commitment that is not fraudulent, it was not false, and the intention was not to mislead at the time that it was made is still not fraud, just because you relied on that statement. But we would argue also, Your Honor, that there is no justified... Reliance under fraud law under Kentucky has to be justifiable. And there is clear Kentucky law, it's the Rivermont Inns case, that says you cannot as a matter of law justifiably rely on an alleged commitment that is contradicted by prior writings that you signed. And in this case, that's dispositive. The appellants admit that they had signed at least five documents that limited First Southern's liability to lend them additional funding, actually included language saying that any future commitments to lend additional funding must be in writing before they will be made. And therefore, there cannot be justifiable reliance as a matter of Kentucky law on those types of statements. There's also a case in Kentucky, it's the Flegel's case, which we cited in our brief, that just states the proposition that the law imposes upon the recipient of representations a duty to exercise common sense. This record is replete with evidence that Dr. Scott is a sophisticated citizen, dentist and businessman, well-educated. He testified in his deposition that he'd been through the lending process before, he understood how it worked, he understood that the bank had to collect certain information from a borrower and had to do its due diligence, had to understand the amount of the loan that was being requested before it could approve somebody for a loan. And so then turning around and saying, I believe that you would lend me an additional $650,000 without having any understanding of any of that, that frankly defies common sense and cannot be justifiable reliance, especially in light of the additional evidence in this case that indicated that Dr. Scott wasn't relying on the bank. His first text to the bank about asking for additional funds was, if you can't do this, let me know, I'll ask PNC. That's not just, that's not relying on the bank. So we would submit that there are significant legal issues with the fraud claim, even if the court were to choose to find that that argument was not waived on appeal. And I'd like to back up for just a second to a preemption argument that was made below and discuss that for a moment. The district court found that the preemption provisions in the Fair Credit Reporting Act barred several of the appellant's state law claims, including the duty of good faith and fair dealing and the tortious interference claim. And we would submit that that was a correct holding and analysis. The Fair Credit Reporting Act has, it incorporates two preemption provisions. And more recently, one was enacted back in 1970, one was enacted more recently in 1996. And the one in 1996 has given courts a little bit of trouble because it, the language of the preemption provision reads much more broadly than the originally enacted provision. And so some courts have struggled to try to reconcile the two provisions, but the circuit courts that have addressed this issue, including this one in an unpublished... That's correct, Your Honor. They have all held that the later enacted statute, 681T, and I won't give the rest of the site because it's lengthy, is actually, preempts a more broader swath of claims. The circuit has not weighed in yet on that claim. The circuit in an unpublished... At the circuit level. Order. Yes, that's correct, Your Honor. Not in a published opinion, in an unpublished case of Sparks that we appended to the brief, they did weigh in positively, citing the Seventh and Second Circuit cases that have addressed this in a positive light and agreeing with that. And so we would argue that that construction of the preemption provision is the correct construction that should be applied in this case and should result in an affirmance of the district court's decision to dismiss the state tort law claims that are preempted by the statute because they allege activity by a furnisher in furnishing information to a credit reporting agency. But in the event that the court chose not to read the preemption provision that way, there is still ample basis in the record to affirm the district court's dismissal. And I'll first briefly address the duty of good faith and fair dealing. Under Kentucky law, the duty of good faith and fair dealing requires that a plaintiff provide evidence that the defendant engaged in conduct that denied them the benefit of the bargain by the parties. This is not an opportunity for a plaintiff to create new contractual obligations out of whole cloth. It is just a statement that if there are enforceable contractual obligations and one party denies the other party the benefit of that bargain, then there can be a recovery. And in this case, there is no dispute that the contracts that were agreed to, the line of credit and the construction loan, they got the full benefit of that bargain. They got all the money that the bank had agreed to lend them under those documents. And those agreements included specific integration clause specifying that they constituted the complete expression of the party's agreement. Thus, under Kentucky law, First Southern would submit that they were not, the Pellants were not denied any benefit of the bargain under the contracts that they reached with the banks. And then secondly, attempting to enforce a promise, an admittedly oral promise that was never documented in the record anywhere, violates the Kentucky statute of frauds at KRS 371-0109 that promises and commitments to loan money must be in writing signed by the parties. Here, and the Scott versus Fork Bank case clearly says that an oral promise to loan money is not enforceable. And the appellants have cited to no written documentation to support any of the commitments that they're alleging. And so we would argue that even if the court chose to read the preemption provision less broadly than the district court did, there's ample basis to affirm the dismissal of the duty of good faith and fair dealing. I quickly want to address the fact that the appellant has also appealed a cross motion for partial summary judgment. And I would just submit to the court that the record is replete with evidence that for Southern disputes that had ever made any commitment to lend additional funds, that the appellants' own text messages refute the idea that that commitment was ever made. And certainly it would be inappropriate to reverse the district court's ruling denying that motion for summary judgment. I see my time is up unless there are any other questions. Thank you, Your Honors. I'll try and do this quickly. Obviously we have an obligation to be careful and not exaggerate. And we have an obligation to candor with the court. On our, on page 28 of our brief, we cited, I'll quote you, Ms. Meyers advised Ms. Dalton, that was the bookkeeper for the Scots, that Mr. Daniel had confirmed that Equifax had acknowledged receipt of the requested change from Appalee, that the error had been corrected, and that the appellants should not pull a credit report to confirm the correction because that would lower their credit score. We cited you right there on page 28. I would urge you to look at the email from Ms. Meyers to Dr. Scott, record 77-32, page ID number 1242, because I could be wrong, but I do not ever remember anyone, any officer beyond Ms. Meyers saying, don't do it just now. They were told, don't do it, not just now. One other thing that I want to address is that future represent, representations about the future, and that's what that Flegel's true value case was. There you had a hardware store fella in Carlisle, Kentucky who agreed to be sort of a, you know, a distributor or a franchisor. And what the court and Judge Abramson properly found was that these were projections or future, you know, in the SEC, it's, there's a phrase for it, future looking, forward looking statements, and that you couldn't rely based a fraud claim on future looking, forward looking statements. So that, that case has absolutely no, no application here. You know, Dr. Scott said that he wanted to believe Mr. Mason, but he also said, Mr. Mason affirmatively said cost overruns will be, will be handled. It's our present intent to take care of that. And the present intent shown by the $56,000 cost overrun figure that he built into the loan documents. He said the same thing afterward. So there's a course of conduct here that supports a fraud claim. I want to bring one thing to your attention here. Oh, I said that the Ham case, we cited that case. It's a Western District of Kentucky case. We cited it in the brief. It's a 211 U.S. District, Lexus, 51756 Western District. It's a Tom, it's a Judge Russell opinion. That case also cites, you know, it's the proposition that parties can, by oral statements, modify a written contract. It cites WH Simmons Company, which is 38 Southwest 2nd, 6. We'll read it if you haven't, we'll read it. And Castle, I want to say Castellini, but it's Castellini case. The last thing I want to point out to you is in our reply brief on page eight, we cited testimony that came from Ms. Dalton. She and Mr. Garska, the accountant for Dr. Scott and Dr. Larkin, met with Mr. Mason and they went over the issue of what would be required, what the bank was going to be looking for on the loan, and the issue of cost overruns. And she testified that as part of the discussion, Mr. Garska, the accountant, sought reassurances to the bank's then present intent to see the project through to completion. And here's the quote, it's on page eight of the reply. So we discussed what would be put up as collateral, what was free and clear. And then there was always, there's always, I mean, there's always more money needed. No project ever finishes within the parameters. So we wanted to make sure that not only was there enough collateral for the initial loan, but if there was any cost overruns in the project, that there would still be additional collateral. Jeff Garska wanted to make sure Dr. Scott did not get in a position where he got the project underway and was not able to finish it because of unforeseen cost. And they came away from that meeting understanding from Mr. Now or down the road to cover cost overruns. That's all I have. Thank you. Thank you very much. And the case is submitted. Let me call the.